IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 24, 2012

**STATE OF TENNESSEE v. HERMAN S. HESTER, JR. (a/k/a "SONNY")**

**Direct Appeal from the Criminal Court for Knox County
Nos. 81023, 81024, 81025 & 82069     Bob R. McGee, Judge**

**No. E2011-00388-CCA-R3-CD - Filed March 1, 2012**

The Defendant, Herman S. Hester, Jr., pled guilty to four counts of selling over 0.5 grams of cocaine. The trial court imposed the ten-year effective sentenced agreed to in the plea agreement and granted the Defendant's request for an alterative sentence, placing him in the Community Alternatives to Prison Program ("CAPP"). The Defendant's alternative sentence supervisor filed a warrant alleging that he had violated the terms of the program. After a hearing, the trial court returned the Defendant to CAPP. The Defendant's supervisor filed a second warrant, and, after a hearing, the trial court revoked the Defendant's alternative sentence and ordered him to serve the balance of his sentence in the Tennessee Department of Correction. On appeal, the Defendant contends the trial court erred when it revoked his probation. After reviewing the record, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Mark E. Stephens and John Halstead, Knoxville, Tennessee, for the appellant, Herman S. Hester, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Randall E. Nichols, District Attorney General; Debbie Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION
I. Facts and Procedural History
A. Guilty Plea**

On January 25, 2004, the Knox County grand jury indicted the Defendant for three counts of selling more than 0.5 grams of cocaine and three counts of delivering more than 0.5 grams of cocaine. On May 31, 2005, the Knox County grand jury indicted the Defendant for selling more than 0.5 grams of cocaine. On February 5, 2010, the Defendant pled guilty to four counts of selling more than 0.5 grams of cocaine, a Class B felony. At the guilty plea submission hearing, the State provided the following basis for the Defendant's guilty plea:

Your Honor, if we were called to trial [in case 81023] in this case the testimony would be that on January 14th, 2003, agents with the Tennessee Bureau of Investigation used a confidential informant to purchase crack cocaine from a black male known as Sonny. The meeting took place at a predetermined location at the Pilot Station located on Merchants Drive next to First Tennessee Bank.

The confidential informant was given marked bills. The vehicle was searched beforehand to make sure there was no contraband in the car. There was not. The confidential informant met with the defendant, purchased an amount of crack cocaine from the defendant. In this case it was 1.1 grams of crack cocaine. All of these events did happen in Knox County, Tennessee.

. . . .

[I]f we were called to trial in [case 81024]. . . we would call the witnesses listed on the indictment. Again, the testimony would be that on February 27th, 2003, agents with the Tennessee Bureau of Investigations met with a confidential informant. This confidential informant was to meet with a black male known as Sonny. They placed a call to purchase a quarter ounce of crack cocaine for three hundred dollars. Before letting the confidential informant meet with the defendant they gave them marked bills, and also searched the vehicle to make sure that there was no contraband in the vehicle. The confidential informant met with the defendant, gave him $300.00. The defendant then gave the confidential informant crack cocaine. In this case it was .7 grams of crack cocaine. All of these events did happen in Knox County, Tennessee.

. . . .

If we were called to trial in . . . [case 81025], your Honor, we'd call the witnesses listed on the indictment, and the testimony would be that on March 11th, 2003, agents with the Tennessee Bureau of Investigations met with a

confidential informant who set up a meeting with the defendant. Again, the same precautions were taken. The confidential informant's vehicle was searched to ensure that there was no contraband. He was given marked denominations of money. He then met with the defendant, gave him $500.00 in order to purchase 3.7 grams of crack cocaine. All of these events did happen in Knox County, Tennessee.

. . . .

Your Honor, if we were called to trial in . . . [case 82069] the testimony would be from officers of the Sheriff's Department that during a drug investigation the defendant was observed and admitted to being involved in a drug transaction. In this case the quantity of crack on the defendant was 6.7 grams. This happened at the BP Station on Northshore and Papermill. All of these events did happen in Knox County, Tennessee.

The Defendant entered a plea of guilty to each of these four counts. The trial court set the Defendant's sentence at ten years, which was the sentenced agreed to by the State and scheduled a sentencing hearing wherein it would decide the manner in which the Defendant would serve his sentence.

### B. Sentencing

At the sentencing hearing, the Defendant's attorney submitted a CAPP report that indicated that the CAPP was willing to work with the Defendant. The State opposed this decision based upon the Defendant's "high risk" for failure. The State noted that he absconded from Tennessee for four years to avoid answering these charges, that he had received additional charges in Florida, and that a Florida order of protection had been issued against him. The trial court stated:

It's only CAPP's willingness to deal with him that I'm entertaining any notion to placing him. And it will be on their terms, if they want him in the long term program then that's what he'll have to be in. And he needs to be in it before I have him released.

After the trial court noted it had "grave misgivings" about placing the Defendant on probation, it ordered the Defendant to the CAPP for probation. The trial court admonished the Defendant that he had to do "everything CAPP says. If they ever tell me that they can't deal with him, then he's headed for prison."

## C. Probation Violation Warrants

On May 28, 2010, the Defendant's supervisor in the CAPP filed a violation warrant, alleging that the Defendant had violated the terms of the CAPP by: (1) lying to CAPP about where he was residing; (2) not living at an approved residence and being unable to confirm if he was abiding by curfew; (3) being behind $25 in court costs; (4) being 24 hours behind in community service; (5) being $45 behind in community corrections fees; and (6) failing to attend all groups as instructed.

At a hearing on this warrant, Courtney Thumma testified she was employed with the CAPP. She said the Defendant began with the CAPP on March 12, 2010, and that, at the time of his acceptance into the program, he was given a list of sixteen requirements of the program. At his "intake," he signed the list and was given a copy. Thumma said she made it "quite clear" to the Defendant that he was not to stay in KCDC housing, where his significant other and children lived. She explained to him that, because of his drug offenses, he was ineligible to live or visit there and that his doing so would constitute trespass. After the first weekend, on March 19, 2010, the Defendant was on the program, he informed the CAPP that he had been staying at KCDC housing. Thumma said she informed the Defendant that he risked having his family evicted from the housing and that she would pursue proper channels to have him be allowed to be at the housing project with his family. She reiterated to him that he was not to stay there "under any circumstances," and she told him to stay at a shelter called "Boot Straps" until she was able to remedy the situation.

Thumma said that on March 26, 2010, she attempted to verify whether the Defendant was at Boot Straps. Boot Straps had no record of the Defendant staying there, meaning that he never registered there. On April 30, 2010, Thumma again called Boot Straps about the Defendant, and the shelter informed her that he had stayed there on April 25, 2010, for one night only. Thumma spoke with the Defendant on April 30, and reminded him again that he was not allowed to stay at KCDC. On that same day, she was able to contact a KCDC representative, explain the situation, and gain approval for the Defendant to stay in the housing project after he had complied with the CAPP successfully for a full year. Thumma said the Defendant was not truthful during their visits about where he had been living, and, on the form he filled out during their meeting, he said he had been living at Boot Straps or the Mission, a different shelter.

Thumma expressed frustration at the Defendant's lack of honesty with her. She said that she was concerned about his inability to be honest about something as simple as where he lived. She said she did not want to be responsible for ensuring that the Defendant followed the rules of the CAPP, including the requirement that he was home by curfew. She asked the trial court to take the Defendant out of the CAPP and order him to serve his

sentence.

On cross-examination, Thumma conceded that the Defendant had successfully passed four drug screens. She said that, while he had missed some group appointments and classes, he had reported to her monthly. Thumma stated that it was unusual for people on the CAPP to miss classes because the classes are scheduled around their work schedule. Thumma testified that offenders in the CAPP are required to work full time, and the Defendant was employed part time when the violation warrant was filed and he was working on becoming a full time employee. Thumma's records indicated that the Defendant did not receive any new charges while participating in the CAPP.

Thumma testified that she contacted KCDC on several occasions about the Defendant living on KCDC property. It was not, however, until the Defendant went and spoke with them personally that they informed him of what he would have to do in order to have his name removed from the trespass list. The Defendant informed Thumma that he was renting a private residence. On May 17, 2010, he told her that he had been staying at the Mission and that he would be able to move into the house in four or five days, after the water heater was fixed.

On redirect examination, Thumma testified that the Defendant had not been staying at the Mission as he had indicated.

The Defendant testified that he was forty-four years old at the time of the hearing and that he had pled guilty to drug offenses that had occurred in 2003, 2004, and 2005. He said that, at that point in his life, he cared about no one else. He decided to change his life because he had hurt "a lot" of people. He expressed disdain for drug dealers and said that he had attempted to work with police but was unsuccessful.

The Defendant spoke about his housing situation, saying that the CAPP had told him that he could stay at KCDC housing if KCDC approved. He said he spoke with Kimberly Davis with KCDC and that she said it was fine for him to stay in the house with his family. This, however, was not "enough" for the CAPP. He conceded that the letter provided to him by KCDC indicated that he could return to KCDC housing after a successful year in the CAPP. The Defendant said he made efforts to comply with the CAPP, finding other housing and working a job. The Defendant said he attended "every class" and that the only class he ever missed was a daytime class, which he missed because he was working. The Defendant said he passed every drug screen successfully and did not get arrested. The Defendant asked the trial judge to return him to the CAPP.

On cross-examination, the Defendant agreed that the charges against him were from

several years before he was placed on probation because he had absconded for over five years. He agreed that he knew that he was supposed to be living at Boot Straps but that he did not comply entirely with that provision. He said, however, he had stayed consistently at Boot Straps and that their records must be wrong if they indicated otherwise. He said he told Thumma that he had stayed with his family and that she told him not to stay there. The Defendant agreed that he still did not comply with Thumma's direction.

The State asked the trial court to revoke the Defendant's probation and send him to the penitentiary. The Defendant's counsel asked that his probation not be revoked because the violations were "technical" and because he had not committed any new offenses. The trial court found:

> Well, it's a troubling case because he didn't pick up new charges. He did apparently try to work. He did attend some classes. He stayed away from drugs, alcohol apparently too. He just wouldn't stay away from KCDC property. And it should have – this should have conveyed to him that because of his drug conviction he was not allowed to come on KCDC property. But this is something called admissions guidelines, it's not a flat out statement, you, Herman Hester, are barred from coming on KCDC property. So perhaps it's not as plain to him as it could have been.
>
> Which clearly he's violated his probation. Clearly he's violated the CAPP guidelines. And the Court considers lying to the probation officer to be a very substantive offense. That's not just a technical offense. That goes to the heart of probation. If the supervisor cannot trust the probationer, then there is no supervision.

The trial court ultimately returned the Defendant to the CAPP. When doing so, however, the trial court admonished the Defendant:

> [The Defendant] needs to understand . . . whatever they tell you is an order from this Court. If they say don't go on KCDC property, that's the same as the Court ordering you to stay off KCDC property. . . . [T]here's no wiggle room now from now on. . . . Anything they tell you is an absolute condition of your probation. . . . . If I find out you lie to them one more time, that's it, you're headed [to prison].

On September 8, 2010, the Defendant's probation supervisor filed a second probation violation warrant. The warrant alleged that the Defendant had violated his probation by lying to CAPP about being unable to report on September 1, 2010, due to having to go to the

hospital and by failing to provide documentation. It further alleged that the Defendant was behind $100 in court costs, forty-eight hours in community service, and $75 in community corrections fees. The trial court held a hearing on January 8, 2011, where the following evidence was presented: Courtney Thumma, the Defendant's case supervisor , testified that she participated in his probation revocation hearing on August 20, 2010, after which he was returned to the CAPP. She said she had learned that the Defendant's wife might be using drugs, so she told him not to reside with his wife. She explained that she would attempt to determine whether the two could reside together but that, in the meantime, he needed to reside at the Mission until they determined the next best option for him.

Thumma testified that the Defendant was instructed to report to the CAPP on September 1, 2010, the day he was scheduled to be released from jail where he had been awaiting the outcome of his first probation violation warrant. The Defendant called the night of September 1, 2010, and said he needed to go to the emergency room to get his insulin. The assistant program manager for the CAPP told him to go to the emergency room and report the next morning at 9:00 a.m. with documentation from the emergency room. When the Defendant reported the following day, he said that he had left the documentation at home. Thumma told him to immediately go home and retrieve the documentation. The Defendant reported on September 3, 2010, and said that his aunt had looked all over her house for the documentation but could not find it. Thumma told the Defendant to go back to the hospital and get another set of documentation showing that he had gone to the hospital and bring it to his next reporting date, September 7, 2010.

On September 7, 2010, the Defendant reported to the CAPP but failed to bring the documentation with him. He told Thumma that he had not had time to go to the emergency room to obtain a copy. Thumma provided the Defendant a medical release, which she faxed to the hospital for verification that he had gone to the emergency room the day he was released. According to the hospital, they had not treated the Defendant since May 2010.

When the Defendant next reported, he informed Thumma's supervisor that he still did not have the documentation from the emergency room. He then said that he never saw a doctor at the hospital but left after sitting at the hospital for an hour because it took too long.

Thumma testified that the Defendant also did not report to the Mission as instructed. He instead stayed at his aunt's house. He did report to the Mission on September 3, 2010, and stayed there until he was arrested on the second violation warrant on September 8, 2010.

Thumma said she did not think she could work with the Defendant, expressing concern about his lack of honesty and his inability to follow her instructions.

On cross-examination, Thumma testified that the Defendant had told her that he stayed with this aunt rather than the Mission and that he had gone to the Mission on September 3. She denied that she was "disappointed" when the Defendant's probation was not revoked after his first violation report, saying that she was "indifferent."

Schan Ellen Branch testified that the Defendant was the father of her three children and that the two had been together since 2003. She said that she picked up the Defendant after he was released from jail for the first violation on September 1, 2010, and the Defendant was not feeling well. She took him to the emergency room at St. Mary's Hospital but they were "really busy." They waited for approximately one and a half hours but never saw a doctor. They instead scheduled an appointment with Cherokee Health for September 3, 2010.

The Defendant testified that, when he was released from jail on September 1, 2010, he was not feeling well, so Schan took him to the hospital. He stayed at the hospital for approximately one hour before leaving without being treated. He said he did not think that he was ever entered into the computer. The Defendant said he went to Cherokee Healthcare, and they set an appointment for him on September 3. He then went to his aunt's house to spend the night. He said he did not go to the Mission because of "[s]tupidity" and "[s]tuborn[ness]."

The Defendant said he reported to the CAPP, where Thumma asked him for documentation of his hospital visit. He told her he had "a paper" at his aunt's house. Thumma told him to retrieve the documentation or she would issue a probation violation warrant against him. The Defendant said he went to the hospital but, because he was not seen, he was unable to get proof that he was there. The Defendant said he reported to the CAPP the following day, but he did not explain to Thumma that he had not been seen at the hospital. He said he did, however, tell her about his appointment with Cherokee Health and provide her proof that he had that appointment.

The Defendant said that when he met with Thumma's supervisor he told her the truth about not receiving treatment. He said he also told her that he did not think that he was being given a fair opportunity to successfully complete the CAPP and asked to be transferred to Nashville or Chattanooga. The Defendant said he knew that he was going to be violated but that he had not run from his problems and still reported to face them.

On cross-examination, the Defendant conceded that he first violated the CAPP three months after being placed in the program. He agreed that, at that time, he had not been truthful with his probation supervisor. He also conceded that immediately after rejoining the program, he did not go to the Mission as instructed but rather stayed at his aunt's house. He

said he was again not truthful with them, telling them that he had received treatment at the emergency room when he had not. He agreed he lied to his probation supervisor a second time when he told her that he could not get the documentation from his aunt's house.

Thumma was recalled and said that the Defendant told her that a doctor had given him a shot of insulin at the hospital, which was untrue.

The trial court found:

> Well, this is a very unfortunate situation. [The Defendant] stands convicted four times of a very serious offense. He was given a chance to serve this sentence outside the prison. He was dishonest with CAPP, brought in for revocation. He was given another chance and continued to be dishonest with CAPP.
>
> The Court would like to be able to find that this was simply a misunderstanding between two people trying to communicate with each other, but this time the Court simply cannot. He told CAPP that he had a shot and went to the hospital, and as it turned out that was a lie. He just makes things up as he goes to – well to – he's going to do things his way. And he'll say whatever he has to to CAPP to stay on probation whether it's true or not.
>
> Now, this is the second time this has happened. I don't – this Court usually doesn't contradict – or usually rule against the probation folks, they – when they ask for a revocation it means that they've been unable to do what they exist to do, which is to help people to be successful on probation.
>
> And the first time around, the Court . . . gave him another chance, and he just went right on being dishonest. I cannot – this Court can't ask CAPP to take him again. It's very unfortunate, but he just won't be honest with his probation officer. And there's no way for him to be successful on probation that way.
>
> So the Court does revoke his probation and remand him to the custody of the Tennessee Department of Corrections.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it revoked his probation. The State counters that the trial court properly revoked the Defendant's probation based upon his refusal to be honest with his probation officer and his refusal to follow the terms of his probation. We agree with the State.

When a trial court determines by a preponderance of the evidence that a probationer has violated the conditions of his or her probation, the trial court has the authority to revoke probation. T.C.A. § 40-35-311(e) (2010). Upon finding that the defendant has violated the conditions of probation, the trial court may revoke the probation and either: (1) order incarceration; (2) order the original probationary period to commence anew; or (3) extend the remaining probationary period for up to two additional years. *State v. Hunter*, 1 S.W.3d 643, 644 (Tenn. 1999); *see* T.C.A. §§ 40-35-308, -310, -311 (2010). The defendant has the right to appeal the revocation of his probation and entry of his original sentence. T.C.A. § 40-35-311(e)(2) (2010). If a trial court revokes a defendant's probation, its options include ordering a defendant to serve the sentence in confinement. T.C.A. § 49-35-310 (2010); *see State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999).

The decision to revoke probation is in the sound discretion of the trial judge. *State v. Kendrick*, 178 S.W.3d 734, 738 (Tenn. Crim. App. 2005); *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). This Court will uphold a trial court's judgment to revoke probation unless the trial court abused its discretion. *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991). To find an abuse of discretion in a probation revocation case, the record must be void of any substantial evidence that would support the trial court's decision that a violation of the conditions of probation occurred. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The record indicates that the Defendant was charged with four drug felony offenses. He fled the state and did not return to answer the charges until several years later. The trial court reluctantly sentenced him to probation, which the State opposed, telling the Defendant to strictly follow his probation rules. Within a few months, the Defendant had violated the terms of his probation by staying in housing that he knew violated the terms of his probation. He also admitted he had lied to his probation officer. The trial court returned the Defendant to probation, again imploring him to listen to the orders of his probation supervisor. The trial court expressed the extreme importance of the Defendant's honesty with his probation supervisor. The day the Defendant left jail, he called the CAPP and informed them that he could not report because he had to go to the emergency room to receive insulin. He reported the next day, maintaining that he had gone to the hospital where a doctor gave him a shot of insulin. His CAPP supervisor asked for documentation. The Defendant told her that the documentation was at his aunt's house, which he admitted later was a lie. He signed a medical release, which showed that he was never treated at the hospital. He also admitted

he stayed with his aunt rather than report to the Mission as instructed. We conclude that the trial court did not abuse its discretion in revoking probation and ordering the Defendant to serve his sentence in confinement.

### III. Conclusion

Based upon the foregoing reasoning and authorities, the judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE